**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| In re: | Chapter 11 - Subchapter V |
| CONTINUOUS CAST ALLOYS, LLC, | Bankruptcy No. 23-04469 |
| Debtor. | Hon. Deborah L. Thorne |
| CONTINUOUS CAST ALLOYS, LLC, | |
| Plaintiff, | |
| v. | Adversary No. 23 A 00093 |
| ERRETT WAREHOUSING LLC; UTICA LEASECO, LLC, RENATE LACROIX, HICKORY GROVE ALLOYS INC., and NATHAN WEIBYE, | |
| Defendants. | |

**NOTICE OF THE DEBTOR'S MOTION ON SHORTENED NOTICE FOR
PRELIMINARY INJUNCTION TO REQUIRE ERRETT WAREHOUSING LLC AND
HICKORY GROVE ALLOYS, INC. TO TURN OVER CERTAIN PROPERTY**

**TO: SEE ATTACHED SERVICE LIST.**

**PLEASE TAKE NOTICE** that on Thursday, May 11, 2023, at 9:30 a.m., I will appear before the Honorable Deborah L. Thorne, or any judge sitting in her place, **either** in courtroom 682 of the Everett McKinley Dirksen United States Courthouse, 219 South Dearborn Street, Chicago, Illinois, **or** electronically as described below, and present the **Debtor's Motion on Shortened Notice for Preliminary Injunction to Require Errett Warehousing LLC and Hickory Grove Alloys, Inc. to Turn Over Certain Property,** a copy of which is attached.

**All parties in interest, including the movant, may appear for the presentment of the motion either in person or electronically using Zoom for Government.**

You may appear electronically by video or telephone.

**To appear by video**, use this link: https://www.zoomgov.com/. Then enter the meeting ID and passcode.

**To appear by telephone**, call Zoom for Government at 1-669-254-5252 or 1-646-828-7666. Then enter the meeting ID and passcode.

**Meeting ID and passcode.** The meeting ID for this hearing is **160 9362 1728**. The meeting ID can also be found on the judge's page on the court's website.

**If you object to this motion** and want it called on the presentment date above, you must file a Notice of Objection no later than two (2) business days before that date. If a Notice of Objection is timely filed, the motion will be called on the presentment date. If no Notice of Objection is timely filed, the court may grant the motion in advance without a hearing.

**Continuous Cast Alloys LLC**

By: */s/   William J. Factor*
One of His Attorneys

William J. Factor (6205675)
Lars A. Peterson (6293551)
**FACTORLAW**
105 W. Madison Street, Suite 1500
Chicago, IL 60602
(312) 878-6146
wfactor@wfactorlaw.com
lpeterson@wfactorlaw.com

4881-5872-0865, v. 2

## CERTIFICATE OF SERVICE

I, William J. Factor, the undersigned attorney, hereby certifies that on May 8, 2023, I caused a copy of the *Notice of Motion* and Accompanying *Motion* to be served on all parties receiving notice through the Court's CM/ECF system and by all other parties via the method indicated on the service list.

*/s/ William J. Factor*

## SERVICE LIST

**Registrants**
(Service via ECF)

**William J Factor**              wfactor@wfactorlaw.com; wfactorlaw@gmail.com;
                                  bsass@wfactorlaw.com; wfactor@ecf.courtdrive.com;
                                  wfactormyecfmail@gmail.com;
                                  factorwr43923@notify.bestcase.com

**Non-Registrants**
(Service via U.S. Mail and/or FedEx)

| | |
|---|---|
| **Continuous Cast Alloys LLC**<br>5823 Giddings Avenue<br>Hinsdale, IL 60521<br>**VIA U.S. MAIL** | **Errett Warehousing LLC**<br>Attn: Brent A Wagner, its Reg. Agnt.<br>1124 Lincoln Hwy<br>Rochelle, IL 61068<br>**VIA FEDERAL EXPRESS** |
| **Renate Lacroix**<br>**Utica Leasing**<br>905 South Boulevard East<br>Rochester Hills, MI 48307<br>**VIA FEDERAL EXPRESS** | **Errett Warehousing LLC**<br>Attn: Timothy W Bruns, its Manager<br>1108 Clifton Terr<br>Rochelle, IL 61068<br>**VIA FEDERAL EXPRESS** |
| **Nathan Weibye**<br>15606 Brooke Shore Dr.<br>Plainfield, IL 60544<br>**VIA FEDERAL EXPRESS** | **Hickory Group Alloys LLC**<br>15606 Brooke Shore Dr.<br>Plainfield, IL 60544<br>**VIA FEDERAL EXPRESS** |

| | |
|---|---|
| **Amerisource Business Capital**<br>7225 Langtry Street<br>Suite 100<br>Houston, TX 77040<br>**VIA FEDERAL EXPRESS** | **Michael Eidelman**<br>**Vedder Price**<br>222 N. LaSalle Street<br>Chicago, IL 60601<br>Counsel to AS Forge<br>**VIA FEDERAL EXPRESS** |
| | **John Wachter**<br>**AS Forge**<br>101 Innovation Drive<br>Homer City, PA 15748<br>**VIA FEDERAL EXPRESS** |

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | Chapter 11 - Subchapter V |
| CONTINUOUS CAST ALLOYS, LLC, | Bankruptcy No. 23-04469 |
| Debtor. | Hon. Deborah L. Thorne |
| CONTINUOUS CAST ALLOYS, LLC, | |
| Plaintiff, | Adversary No. 23 A 00093 |
| v. | |
| ERRETT WAREHOUSING LLC; UTICA LEASECO, LLC, RENATE LACROIX, HICKORY GROVE ALLOYS INC., and NATHAN WEIBYE, | |
| Defendants. | |

**THE DEBTOR'S MOTION ON SHORTENED NOTICE FOR PRELIMINARY INJUNCTION TO REQUIRE ERRETT WAREHOUSING LLC AND HICKORY GROVE ALLOYS, INC. TO TURN OVER SPECIFIC PROPERTY**

Continuous Cast Alloys LLC (the "**Debtor**") requests an order from this Court, under §§ 105(a), 541(a), 542(a), and 544 of the United States Bankruptcy Code (11 U.S.C. §§ 101, *et. seq.*, the "**Bankruptcy Code**"), 740 ILCS 160/8 and Fed. R. Bank. P. 7001 and 7065, (i) requiring Errett Warehousing LLC ("**Errett**") and Hickory Grove Alloys, Inc. ("**Hickory Grove**") to turn over to the Debtor the "Requested Property" (as defined below) and (ii) enjoining Errett and Hickory Grove from using, transferring and otherwise exercising control over the Utica Collateral (as defined below).  In support of this Motion and the entry of the appended order, the Debtor states as follows.

## I.  JURISDICTION

1.  This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois.

2.  Venue of the above-captioned case and of this Motion is proper in this Judicial District pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. §§ 157(b)(1) and (b)(2)(A) and (E).

3.  The statutory grounds for the relief requested include, but are not limited to, §§ 105, 541, 542, 544 and 550 of the Bankruptcy Code and Bankruptcy Rules 7001 and 7056.

## II.  BACKGROUND

4.  The Debtor is a custom manufacturer of premium nickel and cobalt-based alloys for the dental, electrode and rod, jewelry, powder, and wire sectors.  The Debtor specializes in crafting high-quality products for various industries including aerospace, construction, hard-facing, medical, oil & gas, steel, and timber.

5.  On April 3, 2023 (the "**Petition Date**"), the Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code, thereby commencing the above-captioned bankruptcy case (the "**Case**").  The Debtor elected to proceed under the provisions of the Small Business Reorganization Act of 2019 (the "**SBRA**").  Ken Novak has been appointed as the SBRA Trustee.

### A.    Procedural History of the Dispute

6.  On April 20, 2023, the Debtor filed the above-captioned adversary proceeding (Case No. 23-ap-00093, the "**Adversary Proceeding**") against Errett, Utica, and Renate Lacroix ("**Lacroix**," a principal of Utica).   On April 24, 2023, the Debtor filed its Motion for Turnover

2

of Certain Property from Errett Warehousing LLC to the Debtor (the "**Original Turnover Motion**") [Dkt. No. 22] in the main Case.

7. On April 26, 2023, the Debtor presented the Original Turnover Motion, which asked for an order directing Errett to turn over specific property known as the Non-Utica Collateral that was not subject to the liens that Errett acquired when it purchased the secured claim previously held by Utica LeaseCo, LLC ("**Utica**"). The Court set the Original Turnover Motion for further status on May 4, 2023, as opposed to the following week, after the Debtor advised that the facts regarding turnover are fluid and this matter needed a "short leash."

8. On April 28, 2023, the Debtor filed its First Amended Complaint (the "**Complaint**"), which added Hickory Grove and Nathan Weibye ("**Weibye**") as defendants in the Adversary Proceeding. Weibye is the president of Hickory Grove and was employed by the Debtor.

9. On April 28, 2023, the Debtor also filed its Amended Motion on Shortened Notice to Require Errett Warehousing LLC to Turnover Certain Property (the "**Amended Turnover Motion**") [Dkt. No. 6]. The Amended Turnover Motion requested an order directing the turnover of collateral in which Errett did not assert and lien and collateral in which Errett did assert a lien, the latter being the Non-Utica Collateral and the former being the Utica Collateral.

10. On May 4, 2023, at the status hearing before this Court, the Parties discussed the interplay between the Amended Turnover Motion and the Complaint, the overlap between the relief sought in each, and the availability of pretrial relief under § 542. Based upon that exchange, the Debtor agreed to withdraw the Amended Turnover Motion and to file the instant motion seeking turnover in the form of a preliminary injunction under §§105(a) and 542(a). The Debtor also is seeking relief under 740 ILCS 160/8, which authorizes the Court to implement certain remedies when, as here, a Debtor's property is fraudulently transferred.

3

**B.      The Liens on the Debtor's Property.**

11.   The Debtor formerly conducted business from 100 Quarry Road, Rochelle, Illinois

(the "**Building**"), where it operated five production lines through which raw metal inputs were

melted and combined in an induction furnace box and then alloy rods were pulled out in strands

through water cooled dies.

12.   Before the Petition Date, certain of the equipment in the Building was subject to the

liens of Utica, an equipment lender to the Debtor who made certain loans in early 2021. Utica

refused to provide the Debtor with a payoff amount on this debt at a critical juncture before the

Petition Date, so $176,000 represents the Debtor's best estimate of that obligation.

13.   Utica filed a UCC-1 financing statement dated February 22, 2021 (the "**Utica**

**Financing Statement**"), a copy of which is attached hereto as **Exhibit A,** which identifies items

of equipment that Utica asserts are subject to its liens (the "**Utica Collateral**").

14.   The Debtor believes the Utica Collateral has a special and unique value based upon

the dearth of such equipment in the market and the long lead times and high price for new

equipment. Exhibit B (the "**CCA Valuation,**" attached hereto as **Exhibit B**) is a document

prepared by the Debtor earlier this year based upon calls with different vendors and other sources

to obtain estimates of value.

15.   The CCA Valuation establishes that the Utica Collateral is worth more than $1.2

million.[1]  The Debtor has received several expressions of interest from metal processing

---

[1] The Debtor understands that, around the time it entered into its lending relationship with
Utica in early 2021, Utica commissioned an appraisal of the forced liquidation value of the Utica
Collateral, which determined a value of $199,000.  However, the Debtor believes the CCA
Valuation represents a more accurate estimate of the fair market value of the Utica Collateral,
particularly if the property will be used in an ongoing business.

4

companies to purchase the Utica Collateral either as part of a going concern sale of the business

or through other procedures.

16.  In connection with the Utica Loan, a prior lender (Huntington Bank) released its

liens on the Utica Collateral.  In July of 2021, Utica and Amerisource Financial also entered into

an Intercreditor Agreement, pursuant to which Amerisource obtained a junior lien on the Utica

Collateral.  The Debtor does not believe it owes any money to Amerisource at this time.

17.  In addition to the Utica Collateral, the Debtor also owns additional tangible personal

property located in the Building and not included within the scope of the Utica Financing

Statement (the "**Non-Utica Property**") (the Non-Utica Property and the Utica Collateral are

collectively, the "**Requested Property**").  **Exhibit C** contains lists identifying the Non-Utica

Property.

18.  The Non-Utica Property includes the Debtor's inventory of raw materials, work in

process, finished goods, office furniture, personal computers, printers, consumable shop supplies,

saw blades, dies and nozzles, cylinders of liquid Argon,[2] and other items of inventory and

equipment not enumerated on the Utica Financing Statement.  Some or all of the Non-Utica

Property is subject to the liens and security interests of AS Forge.  AS Forge acquired its stake in

some or all of the Non-Utica Property through an assignment of the claim and judgment

previously held by Huntington Bank.

---

[2] According to vendor Airgas, the Debtor is currently in possession of four cylinders of liquid Argon, described as: "(4) CY-AR 160LT22 - CYL ARGON IND LIQ 160LT 22PSI."

5

### C.   Errett's Breach of the Peace and Its Use of Self-Help to Lock the Debtor out of the Building.

19.   Before the Petition Date, Plaintiff and Errett entered into a lease for the Building (the "**Debtor's Lease**").  The Debtor fell behind in making rent payments in the middle of 2022, due to various factors, including partial shutdowns of operations attributable to equipment and personnel issues. Total revenue in 2022 was more than $3.8 million, but about 70% of that was generated during the first part of the year. Errett then sued the Debtor for possession of the Building.

20.   On March 6, 2023, an Agreed Order was entered by the Circuit Court of Ogle County, which granted possession of the Building to Errett.  Within hours of entry of that order, representatives of Errett entered the Building, demanded the Debtor and its employees leave, and barred the Debtor from accessing the Requested Property, including the Non-Utica Property. Errett also violated the Forcible Entry and Detainer Act by using improper self-help measures to breach the peace and force the Debtor out of the Building.  See 735 ILCS 5/9-101 *et. seq*.

### D.   The Foreclosure Sale that Did Not Occur.

21.   On March 9, 2023, Utica mailed a letter to the Debtor at the 100 Quarry Road address, advising that on or after March 20, 2023, Utica would be conducting a private sale of its collateral under Article 9 of the Uniform Commercial Code (the "**Private Sale Notice**").  A copy of the Private Sale Notice is attached as **Exhibit D**.

22.   Shortly after mailing the Private Sale Notice, Utica sold and assigned its debt to Errett through an Assignment Agreement dated on March 13, 2023 (attached hereto as **Exhibit E**).  Utica concealed the assignment transaction from the Debtor until March 20, 2023, presumably because Utica and Errett did not want the Debtor to know that Errett, not Utica, was the entity intending to conduct the foreclosure sale (which never occurred).

6

23.  In this case, the identity of the party that was attempting to foreclose was very material to the Debtor; had it known Errett was driving the foreclosure process, the Debtor would have understood in early March that Errett's ultimate goal was to misappropriate the Debtor's business, and, more importantly, the Debtor would have been able to protect its assets by seeking bankruptcy protection sooner, or other forms of relief.

   **E.    Errett and Utica Actively Prevented the Debtor from Redeeming the Collateral and Paying Utica in Full.**

24.  The Debtor believes its obligation to Utica (and now Errett) is approximately $176,000; however, because Utica refused to provide a payoff amount to the Debtor at a critical juncture on March 8, 2023, the amount may be greater.[3]  The Debtor wanted to learn the precise amount Utica was owed on March 8, 2023, so that the Debtor could effectuate full payment to Utica and obtain a release of Utica's security interest.

25.  In an email dated March 8, 2023, from David Wabick of The Kreshmore Group, Utica was advised of the Debtor's desire to pay Utica in full:

> I just spoke with again with John Wachter from Poly Mathes Capital [aka AS Forge]. They are interested in paying off the CCA lease and or buying the equipment. They have asked me for the pay-off amount. I have attached the last pay-off you provided me on 2/16/23. It is dated 1/11/2023. The pay-off shows a balance due of $216,326.91. On or about 2/17/23 CCA made two payments totaling $40,000. The payments would reduce the balance to $176,326.91 plus/minus any charges or credits additionally incurred after 1/11/2023. Unless this number is materially off, I am going to provide that number to John Wachter as a close estimate of what is due.
>
> He [i.e., Wachter of AS Forge] is going to the site as we speak. He is hoping to view the building and equipment while your

---

[3]  As noted elsewhere, the Assignment Agreement of March 13, 2023, between Utica and Errett recites that the amount owed is approximately $235,000.

4881-5872-0865, v. 2

> representative is there and would hope to be able to finalize a
> deal on the equipment with Utica and CCA today or within the
> next few days at the most.
>
> Please call with any questions. My only intent on being
> involved here is to facilitate UTICA being paid.
> *See* **Exhibit F**.

26. Utica's response to Kreshmore's March 8, 2023, email exposes their complicity in

the civil conspiracy with Errett and Hickory Forge. Instead of providing a payoff amount (which

is a routine request of a lender), Utica falsely told Kreshmore:

> Dave, I have spoken to Igor and texted John Wachter that Igor
> will escort him through the building when he is done. No one is
> preventing John from viewing the equipment. Igor will escort
> him when he is done and that has been communicated to John.
>
> As previously communicated under separate cover, a payoff
> amount is not immediately available. We need everyone to be
> patient. We have engaged counsel and are currently conducting
> an inventory of the equipment.
>
> *See* **Exhibit F**.

27. Utica thus mislead Kreshmore (David Wabick) on March 8, 2023, into believing that

a payoff amount would be forthcoming and that the Debtor just needed "to be patient." The truth

is that by March 8, 2023, Utica had no intention of ever providing a payoff amount because it

was selling its debt to Errett, and wanted to conceal its conduct. Their request for "everyone to

be patient" so they could inventory the equipment was a ruse to buy time. This is evident from

the dates of the key documents, including the Notice of Private Sale (see Exhibit D), which is

dated March 9, 2023, and the Assignment Agreement, which is dated March 13, 2023. Utica

never did provide a payoff amount to the Debtor.

28. The above response from Utica to Kreshmore (*see* supra) shocked Kreshmore

because Utica was being commercially irrational (at the time, the Debtor did not know that Utica

was conspiring with Errett and Hickory Grove).  Shortly after having its request for a payoff

thwarted, Kreshmore advised Utica of this position:

> Renate,
> I am not sure what is going on, but nothing is making sense. A
> group ready, willing and able to pay-off
> the equipment is at the property and they are being prevented
> from them going in to see the equipment. The building group is
> stating that you are not allowing them or Jasons team in to view
> the equipment. I will let Jason's attorney deal with CCA's right
> to supervised access. I can't for the life of me understand why
> Utica would prevent Wachter's group from viewing the
> equipment, with your staff there, so they can pay you off.
>
> After today's events, yesterday's call, and communication from
> the landlord, there seems to be a concerted effort which is
> aimed at preventing CCA from being able to pay-off the lease.
> CCA has a right to pay-off the lease. Something is not right, and
> I am not sure what it is. Please provide an immediate
> pay-off letter and please approve Wachter's group immediate
> access to view the equipment with your
> people.  **Exhibit F**

    **F.**    **Utica Misleads AS Forge and Errett Rebuffs AS Forge's Efforts to Make Errett Whole.**

    29.  By March 17, 2023, some of the antics of Utica began to make sense.  On that date,

the Debtor finally received a copy of the Notice of Private Sale (three days before the sale). The

Debtor then notified a party that had expressed interest in the Debtor's business and that also

held a secured claim against the Debtor, AS Forge, of Utica's proposed disposition.  Believing

that Utica intended to sell the Utica Collateral and that Utica wanted to maximize the value of

the Utica Collateral, AS Forge's principal, John Wachter sent several emails to Utica on March

17, 2023.  The first email asked Utica to send AS Forge the bidding documents for the sale

(attached hereto as **Exhibit G**).  A reply email, which was sent by Utica at 3:43, advised AS

Forge that "Huntington subordinated to us so we could have a first position on the equipment,

which was a requirement of our closing. Huntington does not have a first on the equipment." *Id.*

Later that day, AS Forge then advised Utica that "[i]n the event that there are excess proceeds

from an auction, our position is due on its 2L position" and "[i]n order to avoid any confusion,

we have every intention of bidding at the sale of the assets on March 20, 2023. The purpose is to

effectuate a more meaningful recovery, due to a more widely solicited process. Please send me

the bid procedures, relevant equipment list and a copy of the UCC filings.  Are you interested in

trading your position, as we discussed last week?" *Id.*

30.  As late as March 17, 2023, Utica was providing false and misleading information

about its efforts to dispose of the Utica Collateral.  Instead of advising AS Forge that it had sold

its debt to Errett on March 13, 2023, and that it was not disposing of the Utica Collateral (Errett

was), Utica was holding steadfast to the ruse that it was still the holder of the debt against the

Debtor and communicating with AS Forge as if nothing had changed.  Utica's communications

regarding the Debtor's property were misleading and fraudulent and made with the intent to

conceal the fact that Utica was conspiring with Errett and Hickory Grove.

31.  Eventually, Utica disclosed on March 20, 2023, that it had assigned its debt to Errett,

although the date of the assignment was yet to be known at that time. This is problematic for

many reasons, not the least of which is that the Notice of Sale advised that Utica was the secured

creditor and that Utica would be disposing of the Utica Collateral in a private sale after March

20, 2023.

32.  After AS Forge learned that Utica assigned its debt and security interest to Errett, AS

Forge then contacted a principal of Errett and offered to acquire the real estate and the Utica

Collateral on an expedited basis. John Wachter advised Errett on March 24, 2023:

> Below are timing and the economics. As I stated, I structured
> the option to be punitive towards us — you can rest assured that

10

> I wont dilly dally trying to close. (I have already asked my title
> broker to check in with me Tuesday for a "go , no go.")
> We will sign, escrow the signature pages with your attorney,
> wires will go out by 2pm local to a trust account OR direct the
> next morning.
> Timing :
>
> 1) My team would be in Chicago by late morning, and in
> Rochelle by 12p local.
> 2) We would look to assess, organize, etc….2p local
> 3) Final execution of Purchase and Sale of Assets; final
> execution of the temporary lease with the option to buy ….6pm
> local.  (attached hereto as **Exhibit H**).

33.  Errett responded to this offer, which would have made them whole, by stating that it

*intended* to enter into a long-term lease and that it was looking for a premium recovery on its

debt:

> I understand you have a need to find a certain ROI for your
> group. If we were in a position where we needed to sell, I think
> the offer is reasonable & I understand how you came to the
> numbers. We are just not very motivated sellers right now. *We
> are only interested in selling at a premium, which obviously
> doesn't align with your business model. Therefore, we are
> going to sign a long term lease with another group instead of
> selling the building.* Right now that fits in better with our
> business plan.  Exhibit H (emphasis supplied)

34.  Errett's statement on March 24, 2023, to Mr. Wachter is another example of its

obfuscation and misrepresentations regarding its actions.  Unless the lease with Hickory Grove

was back-dated (which could have happened), the record shows that Errett had already entered

into a lease with Hickory Grove when it sent the email to Mr. Wachter; the Hickory Lease (as

defined below) is dated March 23, 2023.

### G.    The Debtor Learns of Some Aspects of the Unholy Alliance between Utica, Errett, and Hickory Grove

35.  The Debtor only learned on or about April 26, 2023, that Errett had entered into a

lease agreement dated March 23, 2023 (the "**Hickory Lease**"), with Hickory Grove, a company

11

a former employee formed the month before.  A copy of the Hickory Lease is appended as

**Exhibit I.** The Hickory Lease confirms the Debtor's initial suspicion that Errett, Utica, and the

Debtor's former employees conspired to usurp the intrinsic value of the Debtor's business and to

put the Debtor out of business. The Hickory Lease also exposes Nicholas Weibye, a former

employee, as the president of Hickory Grove and one of the architects of the conspiracy.

36.   The Hickory Lease further recites that Errett owns the so-called Utica

Collateral and that Hickory Grove will be leasing both the Building and the Utica Collateral.

The same day the Debtor learned of the Hickory Lease, it also was able to view a copy of the

Assignment Agreement between Utica and Errett.  *See* Exhibit E.  The Assignment Agreement

further recites that Utica believes the Debtor owed it $230,000.  Once again, the Debtor's records

indicated the Debtor owed Utica (and presumably Errett) $176,00.  Irrespective of whether the

claim is $176,000 or $230,000, a gross disparity exists between the value of the Utica Collateral

(at least $1,233.943) and the amount owed to the creditor with a lien on the property ($176,000

to $230,000).

32.   Although the Hickory Lease does not shed any light on how Errett obtained

ownership of the Utica Collateral, it does establish that neither Utica nor Errett completed the

private foreclosure sale that was the subject of the March 9, 2023 Notice of Private Sale.

33.   And although Errett asserts it conducted a disposition of the Utica Collateral through

its lease agreement with Hickory Grove, that could not have occurred.  The Notice of Private

Sale, dated March 9, 2023, specifically refers to a private sale under the UCC.  It does not

mention a lease.

### III.  RELIEF REQUESTED

34.  This motion requests the entry of an injunction under §§ 105 and 542(a) of the

Bankruptcy Code and Fed, R Bank. P. 7001 and 7065.  Alternatively, this motion requests the

entry of an injunction under § 8 of the Illinois Uniform Fraudulent Conveyance Act.  This relief

is warranted for the reasons discussed below.

**A.**      **Under Bankruptcy Code §§ 105 and 542, the Court Should Enter a Preliminary Injunction Requiring the Adverse Parties to Deliver All of the Requested Property to the Debtor so that It Can Be Sold or Relocated.**

35.  Section 105(a) of the Bankruptcy Code provides that: "The court may issue any

order, process, or judgment that is necessary or appropriate to carry out the provisions of this

title." 11 U.S.C. § 105(a).  Additionally, Bankruptcy Rule 7065 incorporates Fed. R. Civ. P. 65,

except that a debtor in possession does not need to comply with Rule 65(c)'s bond requirement.

36.  Under §105(a), a bankruptcy court can enter a preliminary injunction compelling a

defendant in an adversary action to turn over property of the estate to the debtor.  *See, e.g., In re

Cross*, 584 B.R. 833, 847 (Bankr. N.D. Ill. 2018) (entering preliminary mandatory injunction

requiring the creditor to return collateral to debtor); *In re Dearborn Process Serv., Inc*., 149 B.R.

872, 882 (Bankr. N.D. Ill. 1993) (entering preliminary mandatory injunction requiring defendant

in adversary proceeding to turn over property of the estate to the debtor).

37.  Section 542(a) of the Bankruptcy Code provides that an entity in possession,

custody, or control, of property that the trustee may use, sell, or lease under section 363, shall

deliver such property to the trustee and account for, such property or the value of such property.

11 U.S.C. §542(a).

**B.** **There is No Dispute that the Non-Utica Collateral Remains Property of the Debtor's Bankruptcy Estate.**

38.  As explained above, the Non-Utica Property is owned by the Debtor and is not included within the enumerated items of Utica Collateral that make up Utica's collateral under the Utica Financing Statement.  To the extent the Non-Utica Collateral is subject to the lien of AS Forge, the Debtor intends to work with AS Forge to provide it with whatever protections are needed.

39.  Thus, Errett has no claim to either ownership or a security interest in the Non-Utica Collateral.  Errett has stated on the record that it does not oppose the removal of the Non-Utica Collateral.

**C.** **The Utica Collateral Must be Turned Over to the Debtor.**

40.  The Debtor wishes to move all of the Requested Property out of the Building, including the Utica Collateral, and store it at an appropriate facility under the Debtor's exclusive control so that the Debtor will ultimately be able to "use, sell or lease under section 363" such property, and to prevent its loss, theft, or damage in the hands of Errett or a third party. 11 U.S.C. § 542(a).

41.  Accordingly, the Court should enter an order (i.e., an injunction) ordering Errett to give the Debtor meaningful and continued access to the Requested Property, including the Utica Collateral, so that the Debtor can plan to retrieve it and then retrieve it.

**(1)** **The Requirements for a Preliminary Injunction have been Met.**

42.  Outside the context of a Chapter 11 case, it is well settled that "Plaintiffs who seek a preliminary injunction must show that (1) they will suffer irreparable harm in the absence of an injunction, (2) traditional legal remedies are inadequate to remedy the harm, and (3) they have some likelihood of success on the merits." *Camelot Banquet Rooms, Inc. v. United States Small*

14

*Bus. Admin.*, 14 F.4th 624, 628 (7th Cir. 2021). "If those elements are shown, the court must

then balance the harm the moving parties would suffer without an injunction against the harm the

opposing parties would suffer if one is granted, and the court must consider the public interest,

which takes into account the effects of a decision on non-parties." *Id.*

43.    When a Chapter 11 debtor seeks a preliminary injunction to prevent interference with

the Debtor's reorganization, courts often apply a different standard for irreparable harm,

sometimes even concluding that interference with reorganization is irreparable harm as a matter

of law. *See § 2:14. Adversary proceedings—Injunctions, Commercial Bankruptcy Litigation §

2:14* ("In reorganization cases, however, the courts sometimes state the criteria for a preliminary

injunction differently. They state that an injunction is proper only where necessary to protect the

estate or the debtor's ability to reorganize, where there is danger of immediate irreparable harm

to the estate or the debtor's ability to reorganize, where there is a reasonable likelihood of a

successful reorganization, where the harm to the reorganization process exceeds any harm to the

party to be restrained, and where the public interest in a successful reorganization is compatible

with other social goals.").

### a.      The Debtor Is Likely To Succeed on the Merits

44.    To meet the first element for injunctive relief -- a likelihood of success -- the

"plaintiff must demonstrate that "its claim has some likelihood of success on the merits[]." *Mays

v. Dart*, 974 F.3d 810, 822 (7th Cir. 2020). "What amounts to 'some' depends on the facts at

hand because of [the] sliding scale approach." *Id.*

45.    As discussed herein, the Debtor's turnover and other claims have a likelihood of

success because there is a reasonable likelihood the Debtor will establish that (a) the Utica

Collateral is part of the bankruptcy estate, (b) Errett or Utica acted in a commercially

unreasonable manner in the disposition of the Utica Collateral or (c) Errett and Hickory Grove

are participants in a fraudulent conveyance.

> **(i)      The Debtor is likely to succeed on its claim that the Utica Collateral is part of the bankruptcy estate.**

46.  On March 8, 2023, Utica mailed the Notice of Private Sale, which stated that Utica,

as a secured creditor, intended to conduct a private sale on or after March 20, 2023.  *See* Exhibit

D.  There is no quarrel that neither Utica nor Errett, disposed of the Utica Collateral through a

private sale. Instead, Utica assigned its debt to Errett through an Assignment Agreement dated

March 13, 2023.  *See* Exhibit E.

47.  Because no sale, public or private, ever occurred, Errett asserts it disposed of the

Utica Collateral under the UCC, and it did so not by a sale but by entering into the Hickory

Lease.  It is true that § 9-610(a) of the UCC provides that the secured party may "sell" or "lease"

collateral.[4]  810 ILCS 5/9-610.  The UCC is silent, however, as to the effects and requirements of

a lease, other than to expressly require a secured creditor to provide reasonable notice of how it

will dispose of the collateral and to do so in a commercially reasonable manner.  *See* 810 ILCS

5/9-610 through 5/9-613.

---

[4] Section 9-610(a) provides that:

> Disposition after default. After default, a secured party may sell, lease, license, or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing.  810 ILCS 5/9-610.

48. It also should be noted that Errett, as the putative owner of the Utica Collateral, could ***not have*** acquired it through a private sale because the UCC expressly states that a secured creditor cannot purchase collateral (i.e., credit bid) at a private sale. *See* UCC § 9-610(c).[5]

49. Because the only alleged disposition of the Utica Collateral occurred exclusively through a lease, the title of the Utica Collateral remains with the Debtor. A lease does not involve the passage of title. *Radina v. Wieland Sales, Inc.*, 297 Mich. App. 369, 374–75, 824 N.W.2d 587, 590, 2012 WL 2913742 (2012) ("Because the merchandise was furnished through a lease rather than a sale, no passing of title occurred during these transactions").

50. Because the Utica Lease did not transfer title to Hickory Grove, and because Errett could not have acquired title through a private sale or otherwise, Errett only had a possessory interest in the Utica Collateral, which it then conveyed to Hickory Grove.  It is well-settled that property in the possession of a secured creditor remains part of the bankruptcy estate until the creditor transfers the title to a new owner. The seminal case on this point is *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 103 S. Ct. 2309 (1983).

51. In *Whiting Pools*, the Internal Revenue Service levied prepetition, upon the taxpayer's personal property. It had also seized and was in possession of that personal property before the taxpayer filed a voluntary Chapter 11 bankruptcy petition. *Id.*, 462 U.S. at 200, 103

---

[5] (c) Purchase by secured party. A secured party may purchase collateral:(1) at a public disposition; or (2) at a private disposition only if the collateral is of a kind that is customarily sold on a recognized market or the subject of widely distributed standard price quotations.

17

S.Ct. 2309. Under federal law, as with the UCC, the debtor had a right of redemption until the

time of sale by the IRS. 26 U.S.C. § 6337(a). Indeed, the Court noted:

> The Service's interest in seized property is its lien on that
> property. The Internal Revenue Code's levy and seizure
> provisions, 26 U.S.C. §§ 6331 and 6332, are special procedural
> devices available *734 to the IRS to protect and satisfy its liens
> ... and are analogous to the remedies available to private secured
> creditors. See Uniform Commercial Code § 9–503,10 3A
> U.L.A. 211–212 (1981); n. 14, supra. They are provisional
> remedies that do not determine the Service's rights to the seized
> property, but merely bring the property into the Service's legal
> custody.

462 U.S. at 210–11, 103 S.Ct. 2309 (emphasis added).

52.    After *Whiting Pools,* it is settled in this jurisdiction that property in the possession of

a secured creditor still belongs to the bankruptcy estate until the secured creditor has completed a

sale of the collateral by transferring title to a new owner or retaining title.  *See Thompson v. Gen.*

*Motors Acceptance Corp.*, LLC, 566 F.3d 699, 704 (7th Cir. 2009) ("The majority of appellate

courts have found that section 542(a) works with the stay provision in section 362(a) "to draw

back into the estate a right of possession that is claimed by a lien creditor pursuant to a pre-

petition seizure; the Code then substitutes 'adequate protection' for possession as one of the lien

creditor's rights in the bankruptcy case.").

        **(ii)**      **The Debtor has Some Likelihood of Establishing that the
Disposition of the Collateral Was Not Commercially
Reasonable.**

                **(a)**      **The mechanics of the disposition are misleading,
fraudulent and far from commercially reasonable.**

53.   The Debtor also is likely to prevail on its claims against Errett and Utica because the

process used to dispose of the Utica Collateral was commercially unreasonable.  The process

lacked appropriate notification, as required by UCC § 9-611, the absence of which strongly

suggests that the sale was not commercially reasonable.  *See, e.g., Matter of Excello Press, Inc*.,
890 F.2d 896, 905 (7th Cir. 1989) ("Lack of notice … is suggestive on the question whether the
sale was conducted in a commercially reasonable fashion."); *Com. Cap., L.P. v. Eriksen*, 2012 IL
App (2d) 101334-U, ¶ 14 ("One factor relevant to assessing whether a creditor's acts are
reasonable is the notice provided to the debtor.").

54.  After Errett acquired the Utica debt (assuming it was acquired on March 13, 2023),
Errett did not send a new notice of the disposition of the Utica Collateral.  There is thus no
dispute that Errett, *as the secured creditor*, never provided any notice of a disposition of
collateral.  That is fatal to Errett's ultimate contention that it acted in a commercially reasonable
manner and that it complied with UCC §§9-610 through 9-613.[6]

55.  Although the Notice of Private Sale contained some of the information typically
required in a notice of collateral disposition, the information is materially wrong and materially
misleading. The notice stated that Utica, as the secured creditor, was disposing of the Utica
Collateral through a sale, but Errett was the secured creditor after March 13, 2023, so the notice
contained materially misleading information regarding a critical fact; the identity of the secured
creditor.  Similarly, the notice stated that the Utica Collateral would be sold at a private sale, but
that did not occur because no private sale was ever held.

56.  The defects in the notice of sale are not minor, but instead they are seriously
misleading.  The relationship between the Debtor and Errett was very contentious in early

---

[6]810 ILCS 5/9-611 provides that:

> (b) Notification of disposition required. Except as otherwise
> provided in subsection (d), a secured party that disposes of
> collateral under Section 9-610 shall send to the persons
> specified in subsection (c) a reasonable authenticated
> notification of disposition

March, after Errett prevented the Debtor from accessing the Building and the Requested

Property.

57.  If the Debtor had known that Errett was planning to dispose of the Utica Collateral,

the Debtor would have understood much earlier that Errett was scheming to misappropriate the

entire business instead of regaining possession of the Building.  The Debtor would have

exercised its rights and remedies vis-à-vis Errett and Utica much earlier.  The false information

in the Notice of Private Sale was thus very material to the Debtor and was thus seriously

misleading. In fact, Utica withheld from the Debtor and AS Forge critical information regarding

the identity of the secured creditor after March 13, 2023, because it realized the importance of

that information.

**(b)    The price obtained through the disposition is grossly inadequate.**

58.  The gross disparity in the amount received through the alleged disposition of the

Utica Collateral and the value of the Utica Collateral is further evidence that Utica and / or Errett

failed to conduct a "commercially reasonable" disposition of the Utica Collateral.  *See* 810 ILCS

5/9-610(b).[7]  Although not dispositive, the price obtained at a disposition of collateral is the most

important determinant of commercial reasonableness. As observed by White & Summers:

---

[7] Section 9-610(b) further provides that:

> (b) Commercially reasonable disposition. Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable. If commercially reasonable, a secured party may dispose of collateral by public or private proceedings, by one or more contracts, as a unit or in parcels, and at any time and place and on any terms.  810 ILCS 5/9-610.

> Despite the disclaimer in section 9-627(a) ("that a greater amount could have been obtained * * * at a different time or in a different method * * * is not of itself sufficient to preclude * * *" a finding of commercial reasonableness), price is everything. The factors we consider in determining whether a sale was commercially reasonable are almost entirely proxies for price.

4 White, Summers, & Hillman, Uniform Commercial Code § 34:21 (6th ed.)

59.   The evidence here shows, and will further show if needed, that the Utica Collateral valued at more than $1.2 million when Utica made the original loan to the Debtor in early 2021. The CCA Valuation also reflects that the subject property, including the Debtor's furnaces, was older than 15 years when valued, thus debunking the likely contention that the property depreciated sharply.

60.   Juxtaposed against the value of the Utica Collateral, the record indicates that the price obtained at any so-called disposition is limited to the $176,000 to $230,000 the Debtor owed to Utica in early March 2023.  In other words, any amounts that Errett receives in excess of $230,000 (at the high end) will not inure to the Debtor's benefit under the Hickory Lease, which means the disposition of the Utica Collateral did not fetch anything more than $230,000. Moreover, the record indicates that Errett did not receive any consideration for leasing the Utica Collateral to Hickory Grove, since the lease payments relate to the rental of the Building.

### (2)    Debtor Will Suffer Irreparable Harm Before Final Resolution

61.   The Debtor's revenue climbed from $2,087,466 in 2021 to $3,845,201 in 2022.  *See* Statement of Financial Affairs, Dkt. No. 25, p. 61 of 85.  The Debtor's revenue would have been substantially higher during this time if not for temporary shutdowns that negatively impacted the Debtor's cash flow and ultimately led it to default on the lease with Errett.

62.   The Debtor also recognizes that its ability to continue its upward trajectory requires capital, and thus it had been working with parties to obtain the needed capital, either in the form

21

of an investment or through an acquisition.  The Debtor also was actively seeking a new building

to move the Requested Property, so that it could resume operations promptly and continue to

service its clients and pay its employees.  All of that ended abruptly when Errett locked the

Debtor out of the Building and Errett, Utica and Hickory Grove took the next step in forcing the

Debtor to cease operations permanently.

63.  At this juncture, the Debtor believes it will be able to restart operations and continue

operating in some fashion as a going concern if it is able to reclaim the Requested Property.  The

inability to restart operations promptly will likely cause the permanent loss of employees,

customer relationships, and any residual goodwill.  It also will lead to a loss of value and a

reduction in the distributions to unsecured creditors.

64.  The Debtor thus requires prompt injunctive relief because it will suffer irreparable

harm if it must await the full adjudication of its claims in the Adversary Proceeding.  The

Debtor's ability to explore a possible Chapter 11 rehabilitation and resumption of operations is

blocked by Errett's and Hickory's possession of the Requested Property.  That circumstance

constitutes the type of irreparable harm that warrants injunctive relief.  *See In re Lyondell Chem.*

*Co.*, 402 B.R. 571, 591, 61 Collier Bankr. Cas. 2d 567, 2009 WL 650598 (Bankr. S.D.N.Y.

2009) ("I and other courts have repeatedly noted that when a court is considering an application

under section 105(a) to protect the Debtor's reorganization, the irreparable injury need not be

shown."). *See also § 2:14. Adversary proceedings—Injunctions, Commercial Bankruptcy*

*Litigation § 2:14* ("In reorganization cases, however, the courts sometimes state the criteria for a

preliminary injunction differently. They say that an injunction is proper only where necessary to

protect the estate or the debtor's ability to reorganize, where there is danger of immediate

irreparable harm to the estate or the debtor's ability to reorganize, where there is a reasonable

22

likelihood of a successful reorganization, where the harm to the reorganization process exceeds

any harm to the party to be restrained, and where the public interest in a successful

reorganization is compatible with other social goals.").

### (3)    Available Remedies at Law Are Inadequate

65.  The available remedies at law also are inadequate to compensate the Debtor for the

loss it will suffer without preliminary injunctive relief.  The principal legal remedy is a monetary

judgment for the Adverse Parties' wrongful retention of the Requested Property and their other

misconduct, which may prove inadequate for a variety of reasons, including the fact that Hickory

Grove is a brand new entity without any assets and Errett's ability to pay a substantial judgment

also is unknown.

66.  A monetary judgment also would likely be inadequate to compensate the Debtor for

several additional reasons.  First, the Requested Property constitutes the core of a customized

production operation which the Debtor has carefully assembled.  Much of the Requested

Property is highly specialized and could not readily be replaced without undue delay and

expense, even if the Debtor were awarded substantial monetary damages.  Furthermore, the

Adverse Parties' unlawful retention of the Requested Property narrows the Debtor's available

strategic options in bankruptcy, ruling out a possible rehabilitation and significantly impairing

the likelihood of a successful sale under section 363,

### (4)    The Balance of Harms Favors Granting an Injunction

67.  The harm the Debtor would suffer without a preliminary injunction is far greater than

the harm the Adverse Parties would suffer with a preliminary injunction.  As set forth above, the

Debtor's reorganization and its ability to preserve value and pay creditors would be crippled

absent injunctive relief.  The Debtor has a long history of business operations using the

Requested Property to produce custom metal products for customers.  Hickory Grove also is a

newly-created corporation that hopes to replace the Debtor, but has no history of business

operations and no ownership interest in the Requested Property.  Neither Errett nor Hickory has

the experience, connections, or know-how to put the Requested Property to productive use or

maximize its value in a sale.

68.  Furthermore, the Debtor presently is not seeking to invalidate the lien that Errett

holds on the Utica Collateral, and given the substantial equity in that property, ordering its

turnover would not cause any harm to Errett.

### (5)    The Public Interest Favors an Injunction

69.  A preliminary injunction requiring turnover of the Requested Property, under 11

U.S.C. §§ 105(a) and 542, would further the policies of the Bankruptcy Code and would not

otherwise be against the public interest.  The Adverse Parties' attempts to unlawfully gain

ownership of the Debtor's property in contravention of the requirements of the UCC and the

Bankruptcy Code offend the public interest and should not be protected by the Court.  The public

will not be harmed by the lawful preservation of the Debtor's property rights.

**D.    The Court should Enjoin Errett and Hickory Grove from Using or Further Disposing of the Utica Collateral under the Illinois UFTA.**

70.  Section 544 of the Bankruptcy Code and 740 ILCS 160/8 collectively authorize the

Court to enter an injunction against the further disposition of the Utica Collateral pending the

outcome of the Adversary Proceeding.  The Illinois Uniform Fraudulent Transfer Act provides

that the Court may enter an injunction prohibiting the further disposition of property that is

subject to a fraudulent conveyance claim.  740 ILCS 160/8 ("In an action for relief against a

transfer or obligation under this Act, a creditor, subject to the limitations in Section 9, may

obtain: … (3) subject to applicable principles of equity and in accordance with applicable rules

24

of civil procedure, (A) an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property").

71.  In this case, there is a solid basis to enjoin any further use or disposition of the Utica Collateral to the extent the Court is unable to order its turnover.  The Debtor has a strong likelihood of establishing that Errett and Hickory Grove are liable to the bankruptcy estate under §§ 5 and 6 of the Illinois enactment of the Uniform Fraudulent Transfer Act.  *See generally* 11 U.S.C. § 550.

72.  In this case, the Utica Collateral is worth substantially more than the alleged debt owed to Utica by a factor of 4X or 5X – i.e., Utica was owed $230,000 at best, and the Utica Collateral is worth more than $1.2 million.  Thus, in exchange for the Utica Collateral, the Debtor *did not* receive reasonably equivalent value in the form of a reduction of the Utica or Errett debt.  Losing property worth more than $1.2 million on account of debt that is no greater than $230,000 reflects a gross imbalance in value.

73.  Furthermore, the Debtor was insolvent or had inadequate capital, or was left in those conditions, by the actions of Errett in respect to the alleged foreclosure of the Utica Collateral.

74.  For the reasons set forth in the foregoing discussions, allowing Errett or Hickory Point to further dispose of the Utica Collateral will lead to irreparable harm and enjoining them from disposing of the Utica Collateral will not harm them and will best serve the public interest.

## IV.  REQUEST FOR SHORTENED NOTICE

75.  Motions must be served on at least seven days' notice. Fourth Am. Gen. Order 20-03(7)(f). Time periods for notice set by court order can, however, be shortened for cause. Fed. R. Bankr. P. 9006(c)(1), (d). Here, cause exists to shorten notice of this motion. Because of the nature of the relief requested in this motion and the Debtor's conclusion that the Adverse Parties

will continue to be less than cooperative in turning over property in which they have no interest,

it now appears that the only option is the entry of a preliminary injunction order requiring the

Adverse parties to surrender property of the estate.  Furthermore, the issues raised in this Motion

will be familiar to the Adverse Parties due to the Debtor's previous motions.

WHEREFORE, for all the foregoing reasons, the Debtor respectfully requests that the

Court enter a preliminary injunction, substantially in the form of that appended hereto, which:

1. Grants the Motion, as set forth herein;

2. Pursuant to Fed. R. Civ. P. 65(d)(1)(A), states that (1) the Debtor will otherwise suffer irreparable harm before the final resolution of its claims; (2) available remedies at law are inadequate to compensate the Debtor; and (3) the Debtor has a likelihood of success on the merits; (4) the harm the Debtor would suffer without an injunction outweighs the harm the Adverse Parties would suffer if one is granted, and (5) the public interest, including the effects on non-parties, favors a preliminary injunction.

3. Directs Errett and Hickory Grove to promptly deliver the Requested Property to the Debtor or to grant the Debtor meaningful access to its former location so that it can remove the Requested Property;

4. Enjoins Errett and Hickory Grove from using or further disposing of the Utica Collateral under the Illinois UFTA;

5. Attaches thereto the detailed lists of the Requested Property attached to this Motion;

6. Finds that notice of this motion is sufficient; and

7. Grants the Debtor such other relief as this Court deems appropriate.

Respectfully Submitted.

**Continuous Cast Alloys LLC**

By: _/s/   William J. Factor_____
One of His Attorneys

26

William J. Factor (6205675)
Lars A. Peterson (6293551)
**FACTORLAW**
105 W. Madison Street, Suite 1500
Chicago, IL 60602
(312) 878-6146
wfactor@wfactorlaw.com
lpeterson@wfactorlaw.com

27